YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.* SMITH.

[71 South. 752.]

1. RAILROADS. *Injuries to person on track. Lookout. Trespassers. Precautions. Children. Evidence.*

As a general rule, a railroad company is entitled to a clear track, owes no obligation to keep a lookout for trespassers and is required only to refrain from injuring trespassers after their posi-

tion of peril is discovered, circumstances may, and do, have something to do with the degree of care incumbent upon railroad employer after the trespasser is seen.

2. RAILROADS. *Injuries to persons on track.*

It would be negligent in the employees of a railroad company to anticipate that a child would take care of itself to the same extent as the ordinary adult would.

3. SAME.

Where the employees of a railroad company discover a child of tender year on the track in time to avert an accident and failed to make every possible effort to stop the train, they would be guilty of a wanton wrong.

4. RAILROADS. *Trespassers on track. Children.*

A child though of tender years may be a trespasser on a railroad track.

5. RAILROADS. *Trespassers on tracks. Children.*

Although the age of the child may be important in determining the question of contributory negligence, or the duty of the company after discovering him, the company is, in general, no more bound to keep its premises safe for children who are trespassers, or bare licensees, not invited or enticed by it, that it is to keep them safe for adults.

6. RAILROADS. *Trespassers on track. Evidence.*

Where after a child was seen on a railroad track, immediately every possible effort was made to stop the train and save the child, the railroad company was not negligent.

APPEAL from the circuit court of Quitman county.

HON. W. A. ALCORN, Judge.

Suit by Tiny Bell Smith, by next friend against the Yazoo & Mississippi Valley Railroad Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*St. John Waddell* and *F. H. Montgomery*, for appellant.

*P. H. Lowrey* and *R. A. Tribble,* for appellee.

Cook, P. J., delivered the opinion of the court.

This suit was brought by the appellee, a little girl hardly two years of age, by her next friend and father, in the court below for fourteen thousand dollars damages on account of having her right hand crushed by one of defendant's trains on August 1, 1913, resulting in the loss of all of the hand except the thumb, and in the declaration filed for her it is alleged that the accident was caused by the negligence of appellant's employees in the handling of the train which caused the injury. To appellee's declaration appellant pleaded the general issue of not guilty, and the case was tried before a jury on these pleadings. There was a verdict in favor of the appellee for fourteen thousand dollars, the amount claimed in her declaration, and a motion made by appellant for a new trial, which was overrulled, and a judgment entered against appellant for the amount of the verdict, and from which judgment this appeal is prosecuted.

On August 1, 1913, the defendant owned and was getting gravel from, for the purpose of ballasting and keeping up its railroad track, a gravel pit at a place called Buxton, some three or four miles south of a station called Sarah, on its line of railroad that ran through Tate county, Miss., and on this morning it had loaded a train of fourteen cars with gravel at the pit, with the caboose in front of them and a locomotive behind them, the locomotive, however, headed in the direction of the cars so as to shove the cars in front of it. These cars were equippd with what is calld a "Ledgerwood" engine that was supplied with steam through a pipe from the locomotive engine, and the steam thus supplied to the Ledgerwood engine would draw a heavy plow over the cars, this plow being so shaped that it would shove the gravel, or unload it on each side of the cars as it was pulled over the train. By this arrangement a train of this character could be unloaded along the main line of railroad while under way, and without stopping or obstructing the passage

of other trains. The fourteen cars with the caboose and lo-comotive, constituted this train, and it was destined to be unloaded along the main line of defendant's railroad some distance north of the station of Sarah. One of the witnesses in the case stated that a gravel train thus equipped could be unloaded while under way in ten or fifteen minutes. This train was equipped with air brakes on every car, including caboose and locomotive, and all of the same were in first-class working condi-tion, and were tested and examined by the engineer and conductor before starting out on the trip from the gravel pit. This train pulled out from the gravel pit onto the main line of defendant's track, and started on its jour-ney early in the morning, going north, the caboose and loaded cars being in front of the locomotive, with the locomotive head-on to the cars pushing them, and every-thing in good working order. The crew of the train con-sisted of the conductor, a flagman, an engineer, a fire-man, and a brakeman, and the evidence showed these men were all experienced men in the business in which they were engaged.

The station of Sarah consisted of a depot and a ginning plant on the east side of the railroad track, with Cold-water river on the immediate west side of the railroad, and in a narrow space between the river and the railroad are one or two small stores, and just north of the depot is a blacksmith shop, and just north of it was the home where plaintiff lived; plaintiff's home being along the edge of a cut the railroad enters at that point. South of the de-pot at Sarah, some one hundred and fifty feet, is a road crossing, and north of the depot a distance of four hun-dred and eight feet, is another public road crossing lead-ing from the east westward to a bridge across Coldwater river. Just at this north road crossing, the railroad in going north, enters a cut, on the west bank of which was situated the house where plaintiff lived with her father and mother, the house being situated some two hundred feet or more north of the north public road crossing.

.There was no one living on the east bank of the cut, and the same was growing with trees, and the sides of the cut were probably ten feet deep.

The depot at Sarah is near the center of a curve in the railroad; that is, in coming northward to the depot the curve is to the west; after leaving the depot, going north, the railroad curves to the east until after getting past the north road crossing, where it enters the cut, and there it curves again to the east, and in leaving the cut on the north it curves back again to the west. The cut was occasioned by the line of hills bounding the Mississippi Delta on the east coming down at that point to Coldwater river, and the cut was made through the edge of these hills because at that point the river was only a few feet or a short distance west of the railroad track.

The conductor was in the caboose, and came out on the front platform of same down on the steps, and threw off a message, and, there being none for him to receive, got back up into the caboose. The flagman, expecting the train to come to a full stop, came down off of the caboose where he was stationed to the ground, and, there being no message for them, signalled the engineer to go ahead, and immediately got back up on top of the caboose. The conductor, in the meantime, had got back to his seat in the cupola of the caboose, and was looking out ahead on the west side of the track; the flagman was on top of the caboose, either standing on top of the cupola, or between the cupola and the front end of the caboose. The train did not come to a full stop at the depot, but after finding out that there were no orders for them, the signal was given, and the train proceeded on its way northward, accelerating its speed so that, by the time the caboose reached the road crossing north of the depot, it was running, as stated by some of the witnesses, at from seven to ten miles per hour. There was no one on the public road or at the crossing.

On account of the curve in the track to the east from the depot until after it crossed the north road crossing,

the conductor, being on the west side of the caboose, could
noe see the track ahead. The flagman, however, on top of
the caboose, had a better view; and, as the caboose
reached or was passing over the north road crossing, the
flagman saw something on the track, about one hundred
and fifty feet north of the read crossing, which he did not
at first clearly distinguish, and then he saw that it was
the plaintiff, a little child, a mere baby, out on the track,
and he immediately called to the conductor, "There is
something on the track—I believe it's a baby"—gave the
engineer a stop signal, and ran back to get down off of
the top of the caboose onto the front end to render what
assistance he could. In the cupola, where the conductor's
seat was situated, was an appliance for throwing on all
of the air brakes on the train in an emergency, and as
soon as the flagman called to the conductor that a baby
was on the track, and without ever seeing or knowing
where the child was, the conductor immediately applied
the air in full force and in emergency on the entire train.
The engineer was at his post of duty, and saw the sig-
nal of the flagman to stop, and immediately shut off the
steam and raised his hand to put the air on the train,
and found it had already been applied from the caboose.
The track north of the north road crossing has a slight
downgrade to the north. The child was on the track
about one hundred and fifty feet north of the north road
crossing and at the entrance to the cut, at a point where
a path crossed the track. The child had evidently crawled
over the west rail of the track out of the low weeds and
grass growing up close to the cross-ties, and had straigh-
tened up in the track between the rails when the flag-
man first discovered it, and at which time the caboose,
on which the flagman was standing and in which the
conductor was sitting, was just crossing the north road
crossing and was on the down grade incline of the track.
When the air was applied to the train and the steam shut
off, the impact of the cars in striking each other was vio-
lent, and the noise of same was heard by every one who

testified in the case, and all speak of it as an emergency stop. The train, at the time the child was discovered, was going at a speed variously estimated at from eight to ten miles per hour, and both the engineer and conductor testified that it could not be stopped under a distance of less than three hundred feet, going at the rate of speed it was, and heavily loaded as the cars were.

When the flagman first discovered the child on the track, he did not, at the instant, recognize it as a child, but when he did recognize it, he at once called to the conductor that there was a child on the track, and gave the stop signal to the engineer, and then ran to the ladder, leading from the top of the caboose to the platform, to get down where he could render assistance. The conductor, without ever seeing the child, immediately applied the air to the train with all force, and springing down out of the cupola inside of the cabose, ran out on the platform on the north end of the caboose and saw the child lying with its head and arm on the west rail of the track. Although all of this happened in a few seconds, yet the train had slowed down very greatly and was coming to a stop. The conductor saw, however, that it would not stop before reaching the child. There was a small trestle or drain between him and where the child lay that prevented him from jumping off and running ahead of the train to the child, this drain being so wide and deep that he could not jump it or get across it and beat the train to the child. The child was lying with its head and arm on the west rail of the track just north of this drain, some of the witnesses say within thirty feet of it, and the conductor stepped down on the lower step of the platform on the west side of the caboose, and holding on to the iron rail of the platform with his right hand, leaned over, and with his left hand shoved the little child's head and body off of the rail, but it was clinging to the rail with its right hand, which the wheel of the caboose ran over and mangled. The caboose, being the lightest car of the train, and with the air applied, was jumping and jerking as the train was

coming to a stop, and the oscillations of it caused the
foot of the conductor to slip on the step, throwing his
entire weight against his right arm with which he was
holding to the iron railing, skinning his arm, and, if he
had fallen, would have himself been killed by the train.
He saved the life of the child, but was unable to save its
hand. The train came to a dead stop after the caboose
had passed where the child was, about two car lengths,
but before the caboose had passed, the conductor had
jumped off on the ground and picked the little thing up
and gave it to the witness King, who carried it immediate-
ly to its parents. Doctors were employed, and the fin-
gers of the child's hand were amputated, skin grafting
was applied, and within four or five months the hand had
healed over and was comparatively well, with no compli-
cations to be apprehended from the wound.

There were four eyewitnesses to the accident, and
there were the flagman Varn, Conductor Gordon, and
two persons who lived in the neighborhood and were
at the blacksmith shop on the edge of the cut at the time,
having some work done. They were Curtis King and
C. H. Holloman. King and Holloman were introduced
on the trial as witnesses for the plaintiff. Varn, who was
absent when the trial came off, had given a written state-
ment of the occurrence the day after it happened, and
this statement by agreement was taken as his testimony,
and the conductor, Gordon, testified orally.

The witness Varn stated that he was on the top of the
cupola when the caboose reached the north road crossing,
and that when he first saw the child he was unable to tell
what it was on account of the grass and the child being
so small; that when he got nearer he saw that it was a
baby, and immediately called to the conductor that there
was a baby on the track, and ran to the ladder and tried
to get down to get it off, but by the time he could get
off the top of the caboose it had passed by where the child
was, and the conductor had run out on the platform and
reached out and shoved the child off the track, and that

at the time the caboose ran over the child's hand the train was not running exceeding three miles per hour, and stopped in about two car lengths; that everything possible was done to keep from striking the child, but it could not be avoided.

Plaintiff's witness Curtis King stated that he was at the blacksmith shop on the west side of the railroad at the edge of the cut, having some work done at the shop, when the accident happened, and saw the entire occurrence. This witness stated that his attention was first attracted to the train as the caboose was coming over the north road crossing by hearing the air applied to the train, and saw the flagman running on the top of the caboose back to the cupola, and that the conductor was, at the time, in the cupola, and that he then looked along the railroad track and saw the child when the caboose was about thirty feet from it, that he saw the conductor when he applied the air on the train from the cupola, and that the conductor immediately got down out of the cupola and ran out on the steps of the caboose and reached down off of the steps to the child; that the train was then slowing down and stopped in about two car lengths after the caboose had passed the child. Witness further stated that he saw the conductor push the child off of the track, and then jump off of the moving car and pick it up; that the conductor in reaching from the car after the child, came very near falling; that the flagman was the next man to the conductor after he picked the child up, and that witness was the next. In the opinion of this witness the train was going at twelve or fifteen miles per hour when the air was first applied, and that when the alarm was first given about the child, the conductor was in the cupola looking out of the window on the west side. On cross-examination this witness reiterated all the foregoing facts, and in addition thereto described the curve in the railroad at the point of the accident, and the cut, and that the bumping together of the cars when the air was applied was what attracted his attention to the

train; that the flagman and conductor and little child were in plain view, and when asked what he saw the conductor do, replied—

"that he did his work very fast, and that in swinging down off of the steps of the caboose came very near falling."

He was then asked as follows:

"Q. Well, state to the jury there what else there was these two men could have done. (Meaning conductor and flagman). A. I don't think they could have done any more. They done their duty. Mr. Gordon done some mighty fast work or he would have never got out there to save the child. He just saved the child's life."

The plaintiff's witness C. H. Holloman tells of the occurrence as follows: Witness stated that he was at the blacksmith shop, assisting in having some work done to a wagon, and had gotten on his horse to go to a camp from which he was hauling logs, and that his attention was attracted to the train by either the conductor or flagman hollowing, and the man that was hollowing came down off of the caboose, and the car then passed between him and a mound, shutting off his view, and the next he saw was this man standing on the steps of the caboose, and he then saw him jump off of the step, pick up the child, and that the caboose stopped in about two car lengths; that at the time he saw the man on the steps of the caboose, he was leaning over reaching down toward the ties in a dangerous position, and that the train was, at the time, making an emergency stop; that if the conductor had fallen off at the time he was reaching down, the train would have run over him.

The question was then asked the witness as follows:

"Q. The fact is there is nothing in the world that conductor could have done to save that child except what he did do, was there? A. No, sir."

The conductor, Gordon, says that he expected to stop at the depot at Sarah for orders and as the caboose passed the depot, the train having slowed up to some

three or four miles per hour, he threw off a message, and, learning that there were no orders for him, got back up in the caboose and took his seat in the cupola, with his hand resting on or near the air valve, and was looking out ahead or northward along the track; that the flagman had got down off of the caboose onto the ground, and had given the engineer the signal to come ahead, and had then gone back on top of the caboose, which was his proper station; that in passing Sarah all proper signals were given for both crossings, and the bell was kept ringing; and that when the signal was given the engineer to come ahead, the speed of the train was accelerated so that, when the caboose reached the north road crossing, they were going about eight miles per hour. He further stated that from his seat in the cupola looking out on the west side of the train, he did not have a full view of the track ahead on account of the curve in the track, and that about the time the caboose reached the north road crossing the flagman hollowed to him that there was something on the track; he believed it was a baby; that he (the witness) immediately applied the air to the train in emergency; that at the time he did not see the child, and that it did not take him a second to apply the air brakes to the train, and that he immediately jumped down out of the cupola and got out on the front platform of the caboose and saw the child just ahead of the caboose, and it was then in a reeling position, with its head and arms on the west rail of the track, and that he got down on the lower step of the caboose platform, holding onto the iron rails with his right hand and reaching over to pick the child up, but the jerking of the train over-balanced him, and he missed the child, barely touching it; that as he swung back he shoved the child's head and body off of the rail, and then almost immediately stepped off on the ground and pulled the child out from under the car and handed it to Curtis King, who had got there by that time. Witness further states that the caboose stopped in about two car lengths after pasing the child. He further stated that

when he was overbalanced by the jerking and rolling of the caboose, that it threw all his weight against his right arm, skinning the arm some, but that he held on until he had pushed the child off of the rail. This witness was then asked why he could not, when the train was coming to a stop, jump off and run ahead and beat it to the child, and answered as follows:

"A. I could not jump off and run ahead of the train the way the track was there. If I had jumped off before I got to the trestle, I could not have gotten across, and after I got on the trestle there was not room enough on the side to get back on top of the dump and outrun the train. If there had been a level place like a road crossing or depot, I could have got off and outrun the train."

When the train passed the depot, going north, all the employees were at their posts of duty; the engineer was in his place where he could control the engine on a second's notice; the fireman was at his post of duty; the flagman was on top of the caboose, keeping a lookout ahead, having his attention first directed to the north public road crossing, seeing that everything was clear at that place, and the conductor was in his place in the cupola of the caboose, with his hand on the air valve, and all proper signals had been given by the engineer, such as blowing the whistle for the crossing and depot, and the ringing of the bell. The brakeman was on the engine or the car just ahead of the engine, having been instructed to stay on that end of the train in order to protect the train in case of a stop on the main line; that is, the brakeman would go back from that end of the train with the flag. The train was about six hundred feet in length, and the cars loaded with gravel would average, including the weight of the car, sixty-five or seventy tons to the car. These employees in charge of the train all acted promptly and expeditiously when the child was discovered on the track one hundred and fifty feet beyond the north road crossing, as above set forth.

The father of the child, and in whose name this suit was brought as next friend, states that the accident happened about half past seven o'clock in the morning on August 1, 1913, and just before it happened he was lying on the porch of his house up on the edge of the cut on the west side of the railroad, his house being some two hundred feet north of the north road crossing, and was playing with his youngest child, a baby, and that 'the plaintiff came and lay down on the pallet with him, and he sent her to bring his shoes, and she brought them, and afterwards he did not notice where she went. He further stated that some few minutes before the plaintiff brought him his shoes, he had sent another daughter, a half-sister of plaintiff about thirteen years of age, to set out some potato slips in a patch he had east of the railroad, and that after this older child had been gone some four or five minutes, his attention was attracted by the jamming together of the cars of the train in coming to a stop, and he heard some one hollow, "Did it kill her?" and he thought at first that his older daughter had got careless and had been struck by the train, but on running out to the gate he was met by the witness King with the little child (plaintiff) in his arms; that the train had stopped by the time he got to the gate, and he found that the plaintiff's hand and fingers had been mashed and torn all to pieces. This statement of facts, taken from appellant's brief, is indorsed by the appellee's counsel as "a fairly accurate statement of the facts so far as it goes, but some salient parts of the evidence are not mentioned."

The additional facts relied on by appellee to sustain the judgment against appellant are that the curves in the track mentioned in appellant's brief did not obstruct the view of the point where the child was injured from any point between the depot and the place of the injury, and that the train crew could have seen from the top of the caboose or from the rear of the platform of the caboose the scene of the injury at any point between the depot

and the place of the accident. The fact that the flagman said the child was in the middle of the track when he first saw her is stressed as an important feature of the case. Appellee's counsel conclude from the evidence that the child had gotten across the track, and, hearing the approaching train, she tried to retreat, and was caught before she had cleared the track, and if the flagman and conductor had been diligent, they could have seen the child in time to have prevented the accident. It is manifest from the entire record that the conductor and flagman made every reasonable effort to save the child after she came into their view. In fact, there is no room for doubt that, after the child was seen, the employees of appellant did everything humanly possible to prevent the injury.

Of what negligence is complaint made? It is asserted that, when the train reached the depot, the flagman, for no reason, abandoned his place on the rear of the train, and got off on the ground, and that his absence from his station at the crucial moment was the proximate cause of the accident. It is assumed that the employees were negligent if they failed to keep a lookout for the child on the track; that if the flagman had remained at his post he could have seen the child in time to give the alarm, stop the train, and save the child. It only remains for us to decide whether or not the appellant was bound to lookout for children on the track.

As a general rule, a railroad company is entitled to a clear track, owes no obligation to keep a lookout for trespassers, and is required only to refrain from injuring trespassers after their position of peril is discovered. Of course, circumstances may, and do, have something to do with the degree of care incumbent upon railroad employees after the trespasser is seen.

It is no doubt true that it would be negligent to anticipate that a child would take care of itself to the same extent as the ordinary adult would. It may not be too much to say that had the employees of the railroad com-

pany in the present case discovered the child in time to avert the accident, and had failed to make every posible effort to stop the train, they would have been guilty of a wanton wrong.

It is argued here that the child in this case could not be termed a trespasser. There is some conflict in the authorities upon this subject. Some decisions may be found which hold that a child of such tender years cannot be classed a trespasser, but we think the decisions so holding are illogical and unsound. The failure to distinguish trespass from contributory negligence seems to be the weakness in this line of decisions. It might be said that a child cannot be guilty of a willful wrong because of its lack of ability to distinguish right from wrong, but we think the child in this case was a trespasser in the legal sense. Cyc. vol. 33, p. 773. The general rule has been relaxed in the attractive nuisance cases.

*Railroad Co.* v. *Williams*, 69 Miss. 639, 12 So. 957, is not precisely in point, as there was a special plea in that case averring the unusual precocity of the child and her sufficient discretion, but it seems that the court in that case announced a general rule in this language:

"Until he saw the child and her peril, he owed her no other or greater duty than that due any trespasser whatever. Only when the engineer sees the trespasser is a child is he brought under a rule of greater care and caution."

"The true rule seems to be that, although the age of the child may be important in determining the question of contributory negligence, or the duty of the company after discovering him, the company is, in general, no more bound to keep its premises safe for children who are trespassers, or bare licensees, not invited or enticed by it, than it is to keep them safe for adults." Elliott on Railroads, 1259, vol. 3.

We believe that this has always been the rule in this state. Many cases are affirmed wherein it is not ques-

tioned that children may be trespassers, and it is impossible, in our opinion, to sustain any other view.

To restate our views of this case, we think it would be straining the facts unduly to say that any sort of negligence is shown by the evidence, and, besides, if there was negligence, it consisted in the failure of the flagman to remain at his post every instant of the time to maintain a constant lookout for trespassers on the track, and even though the flagman was negligent to this extent, his negligence cannot be of any avail to the plaintiff.

*Reversed and dismissed.*